Thorp v. Fleming.

FRED THORP v. R. F. FLEMING.

No. 15,400.    (96 Pac. 470.)

SYLLABUS BY THE COURT.

1. CHATTEL MORTGAGES—*Possession Taken by Mortgagee.* Under a clause in a chattel mortgage providing that the mortgagee may take possession of the property if he deem himself insecure it is immaterial whether the mortgagee has good cause to believe that he is insecure, if he in fact deem himself to be so.

2. PRACTICE, DISTRICT COURT—*Instructions—Evidence—Materiality of Errors.* Erroneous rulings, if not prejudicial to the rights of a party, may be disregarded; but where the findings are contrary to the evidence, and such errors may have misled the jury, they are material.

Error from Reno district court; PETER J. GALLE, judge. Opinion filed June 6, 1908. Reversed.

## STATEMENT.

R. F. FLEMING cultivated wheat on lands rented under an agreement to deliver to the owner one-third of the wheat, when harvested and thrashed, for the use of the land. Late in the fall of 1904, after the wheat was sown, Fleming removed from the farm to a place twelve miles distant, leaving the farm vacant. In December of the same year he gave his promissory note to the Citizens State Bank for $213, secured by a mortgage on his share of the growing wheat, to be paid August 7, 1905. Fred Thorp was the cashier of that bank, and the land upon which the wheat was growing was conveyed to him by Fleming's lessor in November, 1904. On June 27, 1905, the wheat was ripe, and Thorp caused it to be cut and stacked, thrashed a part of it, and marketed two loads—about 114 bushels. Thrashing was then suspended because of rain. Two weeks later Fleming, after paying the note at the bank, demanded of Thorp two-thirds of the money for the wheat so marketed, and was informed that the amount received was not sufficient to pay the expenses incurred in harvesting. He then told Thorp "to let the rest of it [the wheat] alone," and Thorp promised to do so. No further demand was made for the wheat or its proceeds, and neither party did anything with the remainder of the wheat until the last of the thrashing season. Then, when most of the machines had been "pulled in," Thorp caused it to be thrashed and placed in a bin with that remaining from the first thrashing. Fleming then commenced this action for conversion of his two-thirds of the wheat.

In his answer the defendant pleaded his right to one-third as the owner of the land, alleged that the wheat was ripe and falling down, that the plaintiff neglected to cut and care for it, and that, to preserve

his interest as such owner and to collect the amount due the bank under the lien of the mortgage, he had rightfully harvested the wheat. A copy of the mortgage was attached to the answer. After the action was commenced Thorp sold the wheat and deposited the proceeds in the bank. The wheat measured 508 bushels at the machine, and 489 bushels when marketed. It was sold for $339.86. The expense of harvesting was $140, to which $13 was added for marketing the wheat, which was done after the action was commenced.

On the trial the defendant testified that he entered and cut the wheat to secure his own share, and to collect for the bank the amount due upon the mortgage. The evidence tended to show that it was then ripe and falling down, that the officers of the bank felt insecure, and that the president directed the harvesting to be done. The evidence for the plaintiff tended to show that he had made arrangements to have the harvesting done, but that he was informed by telephone that it was too wet to cut, and hence the delay. Both parties agree that when plaintiff made the demand Thorp promised to let the remaining wheat alone. No reason was given why Fleming did not then proceed to thrash and market it, although he testified that under his contract with the former owner it was his duty to do so. The jury found for the plaintiff, and returned the following special findings:

"(1) Ques. Did Thorp, at the time he entered upon the land and harvested the wheat in question, intend to convert the wheat to his own use and to deprive the plaintiff of any interest therein? Ans. Yes.

"(2) Q. Has the defendant, Thorp, at all times been willing to have an accounting between himself and plaintiff regarding said wheat, and to pay to plaintiff such sum or amount as would be found due him upon such settlement or accounting? A. No."

"(4) Q. Did the witness Soper, as president of the bank, caution Thorp, as cashier of the bank, to look

after this wheat so as to protect the bank's interest?
A. Yes.

"(5) Q. Was Thorp, at the time he entered upon
the land and had the wheat cut, acting for and in the
interest of himself as the landlord, or was he acting
not only for himself but also in the interest of and for
the protection of the bank, for which he was cashier,
under the chattel mortgage which it held? A. For
himself.

"(6) Q. Did Thorp, at the time he entered upon the
land and harvested the wheat in question, act in good
faith and believe that it was necessary for him to do
so in order to protect his interests as a landlord?
A. No.

"(7) Q. Did the president of the bank, Soper, tell
Thorp, cashier, before the wheat was cut, for him
(Thorp) to protect the interests of the bank under
the chattel mortgage and to not let that wheat get
away? A. Yes."

*George A. Vandeveer,* and *F. L. Martin,* for plaintiff
in error.

*W. H. Lewis,* for defendant in error.

The opinion of the court was delivered by

BENSON, J.: The defendant claims that the findings
are not supported by the evidence. There was abun-
dant evidence that the wheat was ripe and falling down
when defendant commenced to cut it. The defendant
testified that he took possession and cut it for the bank
as well as to secure his own interest. The justice be-
fore whom the case was first tried testified that Thorpe
swore that he took it under his lien, and the plaintiff's
attorney testified that the defendant said he took it
under the lease, but he also testified that he knew that
the defendant had set up both claims in his answer,
which was not withdrawn. In the light of this evi-
dence, and the finding that the president of the bank
cautioned the defendant to protect its interest in the
wheat, it is difficult to discover any warrant for find-
ing that the defendant intended wrongfully to convert

the wheat to his own use. It is also difficult to see how the finding that he did not harvest the wheat for the bank as well as for himself is supported. His statement that the quantity sold was insufficient to cover the expenses appeared to be true, and no further disposition of the wheat was made until after the action was brought. The plaintiff might have proceeded to market the remainder of the wheat and take out his interest, and this we must presume was his purpose when he exacted from the defendant the promise to let the rest of it alone; or he might have allowed the defendant to complete the marketing, and then demanded an accounting; but, instead of doing either, he sued for conversion.

The findings challenge a careful scrutiny of the instructions to ascertain if there was any error that would lead the jury to find as they did. The court fairly instructed the jury upon the right of the defendant to harvest the wheat, giving in substance the following instruction requested by the defendant, excepting, however, the words in italics:

"If you find from the evidence that at the time he entered and had the wheat cut he was acting in the interest of, and for and on behalf of, the bank, as well as for himself, and that the bank deemed itself insecure, then his actions were rightful under the chattel mortgage, and the plaintiff can not recover in this action and your verdict should be for the defendant. *In determining this last question it is wholly immaterial whether the bank had good cause to deem itself insecure or not.*"

The proposition so refused was a correct statement of the law. (*Werner v. Bergman*, 28 Kan. 60, 42 Am. Rep. 152.) The mortgage contained the following clause:

"In case . . . the party of the second part shall deem itself insecure, then and thenceforth it shall be lawful for the said party of the second part, or its authorized agent, to enter upon the premises of the said

party of the first part, or any other place or places wherein the said goods and chattels aforesaid may be, to remove and dispose of the same, and all the equity of redemption of the said party of the first part, at public auction or private sale."

Under this clause the defendant had the right to take possession if the proper officers deemed the bank insecure, and whether they had just cause for such belief was not an issue to be tried.

In the cross-examination of the defendant he was asked whether he had proceeded to advertise the wheat for sale by written or printed handbills. An objection to this question was overruled, and the defendant answered that he had not. This was an erroneous ruling. No demand had been made for such proceedings (Gen. Stat. 1901, § 4253), and the mortgagor had consented to a private sale by provision in the mortgage. The finding of the jury that the defendant did not act in good faith in harvesting the wheat may have been, and probably was, influenced by this admission. The ruling of the court would naturally lead the jury to suppose that the failure to advertise was evidence of a wrongful purpose. In this erroneous ruling, in connection with the failure to give the instruction referred to, may perhaps be found the reason why the jury found, apparently against the evidence, that the defendant in harvesting this wheat intended thereby to convert it to his own use, in violation of the plaintiff's rights, and not for the protection of the bank or to protect his own interests as landlord. Errors not prejudicial to the rights of the defendant should be disregarded, but the reasonable inference from the findings, in view of the fact that there was little if any evidence to support them, is that the jury were misled thereby.

The judgment is reversed, with directions to grant a new trial.