No. 41,693

HAROLD M. WELTMER and MARILYN JEAN WELTMER, *Appellees,* v. LLOYD E. MATHIS and CECILE C. MATHIS, *Appellants.*

(349 P. 2d 877)

Opinion filed March 5, 1960.

A. L. Foster, of Parsons, argued the cause and was on the briefs for the appellants.

A. R. Lamb and Paul A. Lamb, both of Coffeyville, argued the cause and were on the briefs for the appellees and cross-appellants.

The opinion of the court was delivered by

JACKSON, J.: This was a suit in equity to determine the rights of the parties growing out of the dissolution of the relationship of landlord and tenant created by a written contract. This is the second appearance of the suit before this court. In *Weltmer v. Mathis*, 182 Kan. 70, 319 P. 2d 165, this court held that the tenants' second amended petition was sufficient as against a demurrer filed by the landlords.

As just indicated the tenants originally brought the suit against the landlords. We shall hereinafter refer to the parties as plaintiffs and defendants. After the return of the suit to the district court, the defendants filed an answer, the plaintiffs a reply and the parties proceeded to trial before the court. The trial court made extensive findings of fact and conclusions of law, and decreed that the defendants were indebted to the plaintiffs in the sum of $2,863.22, and divided the costs of the suit between the parties. The defendants have appealed and the plaintiffs have cross-appealed.

We believe that the findings and conclusions of the trial court will not only give a condensed story of the facts in this case, but will be useful in the discussion of the contentions of the parties. The court's findings and conclusions were as follows:

"FINDINGS OF FACT.

"The Court finds:

"1. That this is an action to recover for the alleged wrongs arising out of a relationship in the nature of landlord and tenant involving a written contract.

"2. That plaintiffs are husband and wife, and defendants are husband and wife.

"3. That defendants were the owners of the real estate described in plaintiff's petition, and a herd of registered polled hereford cattle, all increase of said livestock, hay, grain and feed, and that plaintiffs did not own any livestock, hay, grain, or feed.

"4. That the parties, plaintiffs and defendants, voluntarily signed the written contract herein, admitted into evidence and marked 'Plaintiffs' Exhibit I'; that said contract was entered into by the parties in good faith, and that said parties intended to comply with its provisions.

"5. That on or about March 1, 1954, plaintiffs moved on to said farm where they occupied the improvements, and entered upon the discharge of their duties.

"6. That from March 1, 1954, through February 28, 1955, plaintiffs continued on the farm as tenants under the terms and conditions of said contract, and that at the end of that year, on or about March 1, 1955, a satisfactory settlement was made and had by and between the parties.

"7. That in July and August of 1955, plaintiffs became dissatisfied with certain operations on the farm, and that the parties disagreed on whether or not said farm was overstocked with cattle and the question of selling certain cattle, and further questions as to whether or not there was sufficient feed and facilities on said farm to carry said cattle through the winter.

"8. As a result of said dissatisfaction of plaintiffs and disagreement between the parties, plaintiffs did certain work including plowing of said farm, but plaintiffs did not do certain other work which was to be done in the farming operations.

"9. In August of 1955, plaintiffs made known to defendants that they desired to terminate the relationship and contract as of March 1, 1956.

"10. During the summer and fall of 1955, four cows and one bull from said registered polled hereford herd, the aggregate value of $1900.00, died on said farm, and that two sows owned by defendants, of the value of $90.00, were found dead on said farm from poisoning; that during the summer of 1955, some of defendants' registered cows were exposed to neighbor's grade bulls, and dropped calves of less value than registered calves; that there was extensive and varied disagreements between the parties concerning these losses.

"11. That on or about October 15, 1955, Weltmer submitted to Mathis a statement for $688.75 for services rendered on the Mathis farm, which said services plaintiffs were obligated, under the landlord and tenant relationship, and said written contract, to perform; that this is the demand which provides the basis for plaintiffs' second cause of action.

"12. That on or about October 31, 1955, plaintiffs, through their attorneys, demanded $725.00 from defendants for services rendered by plaintiffs upon said farm, which said services plaintiffs were obligated to perform under their relationship and contract.

"13. That during the early part of November 1955, Mathis instructed Weltmer to deliver twenty-three fat hogs to the market of the Coffeyville Livestock Commission Company, at Coffeyville, Kansas; that said defendant Mathis was by the terms of the contract and the existing relationship, the depository for sums of income from said farm; that on or about November 5, 1955, Weltmer marketed said hogs, and caused said check issued in payment in the sum of $751.94, to be made payable to Harold Weltmer; that further differences arose between the parties concerning this transaction, whereupon payment of said check was stopped; that the proceeds of said sale of hogs, having been paid to the Clerk of the Court, the former holder of said funds is discharged upon said payment being made to the Clerk; that defendants committed no wrongful act in their dealing with the plaintiffs relative to the sale of said hogs which would provide a legal basis for punitive damages, and had no intention of harassing or embarrassing or oppressing the plaintiffs, and that said defendants were free from malice; that if plaintiff Weltmer was embarrassed or humiliated, as a result of this instance, such arose from the differences and disagreements of the parties.

"14. During the latter half of 1955, up to on or about the 2nd day of December 1955, the parties attempted to negotiate settlement of their

differences, although said attempted settlements were not in compliance with the provisions of the contract, these negotiations were unsuccessful and resulted in no meeting of the minds, and said attempts ended in failure to effect a satisfactory settlement to all parties.

"15. That the defendants, on or about November 15, 1955, served written notice on plaintiffs terminating said contract thirty days thereafter; that the parties, plaintiffs and defendants, failed and neglected to abide by and comply with all of the terms of said contract; that during the first half of December, 1955, plaintiffs vacated and moved from said farm; that said defendants then employed other persons as tenants on said farm.

"16. That the farming operations on said farm, from March 1, 1955, to March 1, 1956, resulted in a net profit on said farm of $7,780.59; that plaintiffs' share, as tenants, was one-half thereof, or $3,890.29 and housing and other benefits for said year; that there appears from the evidence the sum of $1,779.01 income from said farm unaccounted for by plaintiffs; that within said amount is included the item for the sale, on or about November 5, 1955, of hogs in an amount of $751.94.

"CONCLUSIONS OF LAW.

The Court concludes, as a matter of law:

"1. That defendants were and are the owners of the real estate, improvements, livestock, polled hereford cattle, hogs, increase therefrom, all hay, grain and feed produced and used on said farm.

"2. That the written contract herein involved, marked 'Exhibit I' was made and entered into by and between the parties in good faith freely and voluntarily; that the parties did not at all times during the year of March 1, 1955, to March 1, 1956, abide by all the provisions of said contract.

"3. That the parties, as landlord and tenant, operated under said contract from March 1, 1954, to March 1, 1955, at about which last date an annual satisfactory settlement was made by and between the parties.

"4. That on March 1, 1955, the parties freely and voluntarily continued their relationship as landlord and tenant in connection with said contract from March 1, 1955, forward.

"5. That when differences arose between the parties, in the summer and fall of 1955, the attempts at settlement, compromise, or agreement of the differences of the parties resulted in failure, and no settlement between the parties.

"6. That the statements and conduct of the parties, relative to the sale of hogs on or about November 5, 1955, were made and done in good faith, were free from malice or coercion, but that said incident was the result of misunderstanding and differences between the parties.

"7. That plaintiffs have failed to meet the burden of proof upon any cause of action for punitive damages, and that judgment thereon is granted in favor of defendants and against plaintiffs.

"8. That due to the differences and disagreements arising during the summer and fall of 1955, each of said parties were prejudiced, and as a result lost certain benefits belonging to them in the relationship of landlord and tenant under the contract.

"9. That plaintiffs' second cause of action is based upon the demand for payment for the performance of plowing and other work and labor upon said farm, which plaintiffs were obligated to perform, and that plaintiffs have failed to meet the burden of proving their second cause of action, and that judgment is granted in favor of defendants and against the plaintiffs, on plaintiffs' second cause of action.

"10. That defendants have made a full and accurate account of all moneys coming into their hands and the net earnings of said farm during the year March 1, 1955, to March 1, 1956, relating to the farming operations, and in accordance with this judgment, defendants' accounting is approved.

"11. That the sum of $751.94 having been paid to the Clerk of this Court, said former holder of said fund is discharged; that said sum of money be and become a part of this judgment and be disbursed by the Clerk of this Court in accordance with the Court's judgment.

"12. That the defendants are indebted to plaintiffs in the sum of $2,863.22, and that said plaintiffs have and take judgment against defendants, and each of them, for said sum; that each of said parties pay one-half of the costs of the action.

"13. That judgment should be, and it is rendered herein, in accordance with the foregoing findings of fact and conclusions of law.

"Signed and dated at Parsons, Kansas, this 14th day of April, 1959."

Although able counsel for both sides strenuously and meticulously argue various alleged errors in the above findings and conclusions, we are compelled to observe that after considering the entire record it would appear the trial court has made a rather equitable and satisfactory decision as to the rights of the parties. It will be of no lasting worth to discuss each of the specifications of the appeal and cross-appeal and we shall confine this opinion to the ultimate contentions of both parties.

One of the chief objections raised by defendants is that the trial court refused to give defendants credit or charge plaintiffs with the sum of $2,124.38 shown by defendants' records to have been expended by defendants for farm work between the time plaintiffs vacated the land in compliance with the defendants' notice to move and March 1, 1956. It is quite true that part X of the written contract provided that defendants might give notice to the plaintiffs and cause them to move in the event they should deem themselves "insecure," and further that "first parties (defendants) may enter and take possession of said real estate, personal property and livestock, employ additional help and charge any necessary expense incident to operation of the farm until the first day of March following the date of said termination to second parties and deduct the total amount of said expense from any sum due

and owing to second parties on said March first." But on its face, such provision is rather unequal and overreaching. No benefit whatever would be realized by plaintiffs for such work, and the term "insecure" as used in a farm contract may well be considered somewhat nebulous.

Moreover, there may have been other considerations which influenced the judge sitting as a chancellor in equity. As found by the court in finding No. 14, there was an attempt made by the parties under the urging of counsel representing both sides to settle their differences. This attempt at settlement did not materialize after plaintiffs had spent considerable time in hauling cattle back and forth to be weighed. There was evidence from which the court might conclude that defendants did not endeavor to make a settlement. On the whole of the matter, we can not say that in equity the court erred in refusing to apply the penalizing provisions of the above contract to its fullest extent.

Defendants argue concerning the application made of the sum of $751.94 derived from the sale of hogs and for which sum a check made to Weltmer was not paid by the bank under directions from Mathis. This amount had been paid into court by the stockyards firm which purchased the hogs, but was charged to plaintiffs in the figure of $1,779.01 (see finding No. 16, *supra*). The court quite rightly found that the money never received by plaintiffs should be subtracted from the amount charged against plaintiffs. In its final decree, as evidenced by the journal entry, the court ordered this sum of $751.94 held by the clerk of the court to be divided between the parties since it represented part of the profit for the year. The amount received by plaintiffs was ordered to be credited upon the judgment received by them. We fail to see any error in this manner of accounting.

As to the objections of plaintiffs on the cross-appeal, they claim that the court should have allowed them to recover for the plowing done by them in the fall of 1955 (see findings Nos. 11 and 12, *supra*). It is true that plaintiffs had given notice that they would not occupy the farm for the next year, and so would not receive benefit from the crops raised thereon, but the contract was still in force under which they had entered, and it would seem they had agreed to perform such work without extra pay. Therefore, we do not believe that it has been made to appear that the court erred in denying plaintiffs extra compensation for this work.

Some complaint is made by plaintiffs that the court failed to award punitive damages because defendants stopped payment on the hog check (finding 13, *supra*). There is practically no evidence of malice on the part of defendants, and the court was justified in refusing this claim. Likewise, the court would seem empowered in equity to settle the rights and cross claims of the parties and settle their accounts without assessing interest on the net amount found due. The court would seem to have decided that neither side was entirely without blame and divided the costs of the suit.

In *Stephens v. Farwell*, 155 Kan. 491, at p. 494, 126 P. 2d 489, this court speaking through Mr. Justice Thiele said:

"It is apparent that plaintiff sought the aid of a court of equity to have determined his right in the premises. The suit is somewhat out of the ordinary, but it is of that class where the court has power to apply settled rules to unusual conditions and to do equity. (*Marquez v. Cave*, 134 Kan. 374, 5 P. 2d 1081; *Stady v. The Texas Company*, 150 Kan. 420, syl. ¶ 5, 94 P. 2d 322.)"

This court now finds that there was no reversible error committed by the trial court in its settlement below and that its decision both as to the appeal and cross-appeal should be affirmed. It is so ordered.

SCHROEDER, J., concurring: While I concur in the result of the court's decision and agree that the trial court, sitting as a court of equity, had full power to settle the differences between the parties, and upon the facts and circumstances presented by the record herein reach the result which it did, I must respectfully dissent from that portion of the opinion which holds paragraph X of the contract invalid and unenforceable for the reasons stated. It was unnecessary for the court to determine the validity of this provision of the contract.

The crux of the appellants' claim on this appeal is found in paragraph X of the contract which reads:

"Part X: It is agreed that in the event second parties [plaintiffs] fail to carry out any provision of this agreement or in the event first parties [defendants] shall deem themselves *insecure*, they shall have the right to terminate this contract within thirty (30) days by giving notice in writing of their intention to do so. And within 30 days from the date of service of said notice this contract shall be thereby terminated. That upon such termination second parties agree to vacate said premises forthwith and peacefully deliver possession thereof to first parties. That first parties may enter and take possession of said real estate, personal property and livestock, *employ additional help and charge*

*any necessary expense incident to operation of the farm until the First day of March following the date of said termination to second parties and deduct the total amount of said expense from any sum due and owing to second parties on said March First."* (Emphasis added.)

Of this provision in the contract the court says:

". . . But on its face, such provision is rather unequal and overreaching. No benefit whatever would be realized by plaintiffs for such work, and the term 'insecure' as used in a farm contract may well be considered somewhat nebulous." (Numbers added.)

From the foregoing language the only conclusion to be drawn is that paragraph X of the contract is of no force and effect in a court of equity for the two reasons given. These reasons will be treated in reverse order.

To say the *insecurity clause* in a farm contract, such as we have here, is "nebulous" and assign such description of the clause as a reason why paragraph X is unequal and overreaching, thus unenforceable in a court of equity, is in my opinion rather shocking.

Reading all of the provisions of the contract herein together, the validity of a provision authorizing termination of the contract in the event the defendants should deem themselves insecure seems obvious. The plaintiffs herein are not seeking a reformation of the contract, they assert the contract.

The provisions of the contract entered into in February, 1954, material herein, provide that the plaintiffs were to enter upon the land and make it their home during the term of the contract and furnish all necessary labor, machinery, implements, equipment and tools, and all oil, fuel, greases and repairs for machinery. They were to farm the land owned by the defendants and any and all land leased by the parties, including all pasture and hay land, under the general direction and supervision of the defendants. The contract specifically provided the plaintiffs were:

". . . to harvest all crops; to mow pastures annually; to provide labor necessary to keep all buildings, fences and other improvements upon the above premises in good repair; to haul and scatter upon the fields, where most needed, all manure made and produced, to allow no obnoxious weeds to go to seed on said premises, sell or burn no straw, grass or corn stocks; furnish labor and equipment for cutting hedge into posts and wood, first parties to have the posts, second parties to have ½ of the wood; deliver to said farm at their own expense all materials, paints, fencing and supplies designated by first parties as necessary to repair buildings, build fences, paint or maintain the improvements; also deliver at their own expense, all fertilizer, seeds and feeds necessarily purchased for the feeding and care of all livestock maintained

on the premises; perform or furnish all labor and equipment necessary for the proper care of all livestock on the farms and leased lands; deliver all produce to local market or selling point at the direction of the first parties and without cost to them; cooperate with first parties for the purposes of entering into any agreement requested by first parties, with the government relative to soil conservation, crop controls or improved farming operations. . . ."

The defendants furnished 560 acres of land in Labette County to the plaintiffs with appurtenances for one year commencing March 1, 1954, to March 1, 1955, and thereafter from year to year until one of the parties gave to the other, prior to the termination of any yearly period, ninety days' notice in writing of an intention to terminate the contract.

The defendants agreed to put upon the premises a minimum of forty registered polled hereford cattle and one registered polled hereford bull, and give the plaintiffs a copy of a complete inventory of all livestock on the premises as of March 1, 1954; that all livestock was to be listed as inventory from year to year, and remain the property of the defendants and the plaintiffs were not to acquire any interest therein. The plaintiffs were required to perform all necessary labor to properly care for the livestock and, if necessary, hire and pay for any additional help needed in the care and maintenance of said livestock.

The plaintiffs were to be compensated for their services in the following manner:

". . . any grain, hay and feed raised upon said premises and any hay, grain and feed raised upon any leased land and not used for feed to said livestock, shall be sold by first parties at the prevailing market prices and the proceeds shall be divided equally between the first and second parties, after deduction of the expense of seed, lime, fertilizer and taxes and insurance upon said real estate, and the rent on any leased lands, at the time of the settlement herein after provided for."

The contract further provided that at the time of annual settlement the plaintiffs:

". . . shall have from first parties [defendants] a sum of money equal to one half of the value of all calves, hogs and chickens, produced from said livestock during the year, less one half the cost of all feed purchased and not raised on said premises and fed to said livestock during contract year, and further less one half of all veterinary fees, medication, breeding and recording fees, advertising, sales cost, insurance and taxes upon all of livestock.

". . . The Value of Registered cattle at the time of settlement shall be commercial market price, by weight and by pound, plus 20%, . . ."

The parties agreed the plaintiffs were to acquire no interest whatever in any of the livestock by reason of this contract, but that

the increase, at the time of settlement, should serve only as a means of determining the amount of money to which the plaintiffs may be entitled at the time of settlement (see finding No. 3).

The plaintiffs agreed that all selling and purchasing was to be done only with the approval of the defendants, who should act as depository for all funds and proceeds from the sale of all farm products and livestock.

They agreed that March 1, 1955, was to be the date of settlement and that no settlement should be made prior to that date; that the plaintiffs would forbear the making of any demand or the bringing of any cause of action against the defendants until the settlement date *or March 1 following any date of termination of this agreement.*

It was agreed the plaintiffs were entitled to butcher for their own use one beef and one hog and divide the same equally with the defendants; and further that the plaintiffs were permitted to keep one milk cow which should be and remain the property of the plaintiffs; and that the plaintiffs were to have all the milk produced from said cow. The plaintiffs also received, free of charge, a garden plot for their exclusive use.

A resort to the evidence presented, in accordance with the allegations of the defendants' answer in this case, will show the obvious necessity and validity of the insecurity clause in the contract. Supplementing finding No. 3, the evidence discloses that the registered polled hereford cattle owned by the defendants on March 1, 1955, to be used as breeding stock under the terms of the contract, consisted of sixty cows and three bulls, also a large number of hogs. The following is from the abstract concerning defendant Mathis' testimony:

"In the summer of 1955, he found a bull calf dead in the pasture and Weltmer had made no mention of it: About September 10 he found cow No. 5, worth $500, dead in the pond; Weltmer had not mentioned it. He asked Weltmer to check the cows; subsequently Mathis checked them himself and found cow No. 47, worth $400, missing. Later discovered she was dead and decomposed in the pasture; Weltmer assured him he had checked the cattle that morning and they were all there. Mathis found Cow No. 73 dead and decomposed. On the day the cattle were weighed, December 1 and 2, 1955, Cow No. 69 was missing. Mathis inquired and Weltmer told him she had been getting out; later Weltmer said that Mathis' brother Harry had let her out through the gate. Mathis later found the cow, worth $400, dead and tractor tracks around her carcass indicated she had been dragged into the ditch. Weltmer was unconcerned about it. On December 6 two of Mathis' sows were found dead. He called Dr. Alter,

who stated they had died from poison. The hogs were kept in a shed on the west side of the barn and did not have access to any other building. They were in a regular hog house. Weltmer was still living on the premises; Mathis asked him about the ailing hogs and he would not come out and look at them. Following December 1 and 2, when they were hauling cattle to be weighed, 4 of the calves died as a result of having contracted pneumonia during the cold, inclement weather. Weltmer permitted Mathis' registered cows to be exposed to grade bulls. In fact, five. That was before Weltmer left and after he left seven more grade calves were dropped from the registered cows. The registered cattle were polled hereford cattle, the herd which Mathis started building in 1944. The difference between the value of a grade calf and a registered calf at the time Mathis commonly sold them, would vary from $100 to $200 per head. Weltmer also permitted several heifers to be bred prematurely. He refused to repair fences as required by contract, after materials were provided."

The defendant Mathis upon finding the two dead sows on December 6th had a veterinarian examine these animals for the cause of death. It was found they died from rat poison containing warfarin which causes internal bleeding. The plaintiffs' explanation was that they must have gotten into it in an old house where corn was being stored. The poison was used in this building to control the rats. Mathis' testimony, above indicated, was that the hogs were never near this building.

Nowhere in the contract does it appear that the plaintiffs were liable for losses of breeding stock owned by the defendants and carried on the inventory.

The insecurity clause contained in paragraph X of the contract herein is similar to the insecurity clause in chattel mortgages where it has repeatedly been held to be valid. Under a clause in a chattel mortgage providing that the mortgagee may take possession of the property if he deem himself insecure, it is immaterial whether the mortgagee has good cause to believe that he is insecure if he in fact deem himself to be so. (*Thorp v. Fleming,* 78 Kan. 237, 96 Pac. 470; *Weldgrube v. Kerns,* 111 Kan. 428, 207 Pac. 654; and *Motor Equipment Co. v. McLaughlin,* 156 Kan. 258, 269, 133 P. 2d 149.)

Conceivably, the court might require more where the insecurity clause in a farm contract is asserted to terminate the contract than an absolute discretionary power, as in the case of a chattel mortgage. A requirement that one act in good faith to terminate such contract may be imposed. But this would place in issue the reasonableness, good faith or capriciousness of the defendant Mathis in

terminating the contract under the insecurity clause. Could it be said upon the evidence heretofore quoted Mathis was acting unreasonably, in bad faith or capriciously in terminating the contract?

The court has been cited to no cases by either of the parties in which an insecurity clause in a farm contract has been considered, and my limited research has disclosed none. Certainly if a precedent is to be established on the point it should receive greater consideration by the court. The kind of farm tenancy contract declared void as against public policy by statute (G. S. 1949, 67-531 to 67-533, incl.) is not presently before the court. The defendants placed a valuable registered herd of cattle in the possession of the plaintiffs, and they were free to bargain as they did by contract concerning the security of the defendants relative to this valuable personal property. The reasons for giving the defendants absolute discretion, if they deemed themselves insecure, are equally as strong as they are in chattel mortgage cases.

The first reason assigned by the court for the invalidity of paragraph X is that no benefit whatever would be realized by the plaintiffs for the work performed after the termination of the contract. The extent to which work was done in feeding and caring for the livestock was of benefit to the plaintiffs, since the trial court took the weight of the cattle as of March 1, 1956, presented by the accounting of Mathis showing the profits from all operations for the year, as the basis upon which to settle the parties' differences (see finding No. 16). If the contract is to have force and effect, it was the plaintiffs' obligation to spread the manure in connection with the feeding of the cattle and hogs, and also to properly keep the fences in repair during the year, before the plaintiffs were entitled to share in the profits on March 1, 1956, in accordance with the terms of the contract.

In my opinion, however, whether or not the plaintiffs received benefits from the work performed after the termination of the contract by the parties in December, 1955, is immaterial for the reason hereafter stated.

The theory upon which the plaintiffs presented their case is not clear from the petition or from the evidence. However, the position taken by counsel for the plaintiffs in his opening statement was as follows:

". . . Our theory in this case is that they had this contract; that the contract was in full force and effect up until the time that they verbally agreed

to rescind it, which was December the 1st, and at that time, under an oral contract between the parties hereto, they agreed to rescind this contract and settle their differences . . ."

The defendants' theory was that the contract was binding; that negotiations to settle the differences between the parties ended in failure; that under the provisions of the contract the accounting was not due until the 1st day of March, 1956; and that by the terms and provisions of the contract they were entitled to its benefits, including specific enforcement of paragraph X. Upon this theory the defendants charged the plaintiffs with the sum of $2,124.38 shown by the defendants' records to have been expended by the defendants for farm work between the time plaintiffs vacated the premises in compliance with the defendants' notice to move and March 1, 1956. The trial court did not approve this item of expense and this is the basis of the defendants' appeal.

The trial court found that the parties failed and neglected to abide and comply with all of the terms of the contract (finding No. 15) and that the attempted settlements were not in compliance with the provisions of the contract (finding No. 14). Looking beyond these findings to the evidence will give better insight into the conclusion ultimately reached by the trial court.

The parties through their respective counsel conducted negotiations for a period of time in which various accountings were submitted to each other, all of which were introduced in evidence, and as negotiations approached a culmination, the plaintiffs' evidence indicates the parties made an oral agreement to weigh the livestock and make a complete settlement thereafter. Weltmer was to use his own truck and haul ninety-four head of cattle (not including the sixty cows and three bulls) and the hogs, which were raised on the premises under the terms of the contract, to Angola starting on December 1, 1955, have them weighed and deliver possession of the livestock to Mathis. Pursuant to this agreement Weltmer did haul and weigh the livestock on the 1st and 2nd days of December at Angola, one and one-half miles from the farm. Mathis denied that he agreed to pay any specific sum of money other than is provided in the written contract. Nevertheless, when the cattle were weighed each of the parties had a commission man present at the scales and they valued the cattle and hogs. Upon return of the cattle to the farm Mathis took possession of the livestock and assumed the responsibility of feeding and caring for such livestock.

Mathis had requested Weltmer to weigh the truck empty after each load of cattle was weighed, but he refused to do this and weighed the truck empty before the hauling started. At the time the truck was weighed empty it was dry and weighed 6,370 pounds. On December 1st and 2nd when the cattle were hauled, it was wet and muddy. Eleven scale tickets showed the empty weight of the truck used in the hauling as 6,370 pounds and five tickets showed the weight of the truck as 6,810 pounds. The second weight was taken on the morning of the 2nd of December, thus indicating that it had accumulated 440 pounds of mud and droppings during the course of hauling on the previous day, all of which was reflected as an added weight to the livestock on each load as it progressively accumulated. Upon discovery of these facts Mathis declined to go any further in settlement.

Counsel for the plaintiffs contend they have no claim for any accounting in this case after December 15, 1955. Weltmer vacated the premises of the defendants between December 4th and 15th. Had the trial court settled the accounts as of this date considerable grain, hay and forage on hand as livestock feed would have had to have been valued. Instead, the trial court determined the case on the basis of an accounting as of March 1, 1956, as provided in the contract, when most of the livestock feed had been consumed and the weight of the cattle presumably increased accordingly.

It is to be further noted that the notice of termination served upon Weltmer was dated the 15th day of November, 1955, (see finding No. 15) at which time the negotiations for settlement had not been broken off (see finding No. 14).

Upon the foregoing facts and circumstances, this being an equitable action for an accounting by the plaintiffs wherein they assert the contract, it may fairly be said the defendant Mathis by his conduct *waived* the provision in paragraph X of the contract which authorized the defendants to charge the cost of operating the farm from December 2, 1955, to March 1, 1956, to the plaintiffs. It was within the province of the trial court to determine whether Mathis, under the circumstances, was negotiating in good faith, and whether the plaintiffs had vacated the premises in good faith pursuant to the oral agreement after weighing the livestock. The fact that negotiations did not result in a satisfactory settlement left the matter open for the equitable consideration of the court.

A factual situation was presented in *Work v. Gas Co.,* 79 Kan. 118, 98 Pac. 801, wherein a provision in a contract authorizing forfeiture was *waived* by the conduct of a party entitled thereto. It was there said in granting equitable relief under a contract the court should go only so far as is just and equitable.

The doctrine of estoppel requires of a party consistency of conduct when inconsistency would work substantial injury to the other party. (*Lillard v. Johnson County,* 102 Kan. 822, 172 Pac. 518, and cases cited therein.)

Whether conduct is to be designated as waiver or estoppel is not very important. (*Nogrady v. Fourth National Bank,* 136 Kan. 43, 47, 12 P. 2d 787.) In *Bank v. Jesch,* 99 Kan. 797, 163 Pac. 150, a landlord sought to prevent a tenant from harvesting a crop he had grown on the land on the theory that the term had expired. It was shown the landlord in conversations did not dispute the right of the tenant but recognized the existence of the right of the tenant to do so, and it was held the landlord was estopped by his conduct and apparent acquiescence to dispute the right of the tenant. It was said:

". . . In order for the conversation narrated to operate as a bar to a subsequent denial of the plaintiff's interest it is not necessary that there should have been a concurrence of all the elements of an estoppel, as the term is usually defined. 'Whether the principle is described as equitable estoppel, *quasi*-estoppel, waiver, ratification, election, or as a requirement of consistency in conduct, is not very important.' (*Powers v. Scharling,* 76 Kan. 855, 859, 92 Pac. 1099.) 'The doctrine of equitable estoppel is frequently applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced.' (10 R. C. L. 694.) . . ." (pp. 799, 800.)

The foregoing reason for denying the appellants' claim for necessary expense incident to operation of the farm after the plaintiffs vacated the premises is consistent with the findings and conclusions (see conclusion No. 8) of the trial court. It is therefore respectfully submitted the trial court should be affirmed without declaring paragraph X of the contract invalid for policy reasons, for this, in my opinion, impairs the obligation of contract.